The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. May it please the Court, for the record, I'm William Hurd. With me today at council table are Justin Gray from the Rosette Firm and David Anthony, also from Troutman Sanders. Our client, the Lac du Désir Band of Lake Superior Chippewa Indians, is based on a reservation in a remote, economically depressed corner of Michigan's Upper Peninsula. It is a long way from here, but several tribal leaders have made the journey here and are in the future of the tribe. Big Picture and Ascension are important to the future of this tribe. And you see in the opinion below and in our brief, many things that these businesses have made possible. A health clinic, housing, scholarships, new space for their tribal court, to name a few. Mr. Hurd, one of the criticisms that your learned opponent suggested goes to precisely this point, that is that the allocation of the revenues from the lending companies really wasn't set out, at least to their satisfaction. What is your response to that? Well, several fold. Number one, let's be clear about what the allocation is. Frankly, I do not know why it is opposing council's business, what business judgments this tribe has made, particularly when there's been no suggestion of any violation of any business judgment rule. But in any event... Well, is that the test? We don't believe that is the test. We believe the test is deference to the tribe. But if one is going to somehow second guess the tribe, there must be some standard for it. And a business judgment rule. But now, what is the allocation? When you use the business judgment rule, are you talking about business judgment in terms of the transactions that the tribe conducted or in terms of what they do with the revenue or both? Well... Because you were on revenue before. So, the revenue, let's be very clear, the revenue is 5%, not 5% of profits, 5% of gross revenue. And that is a very healthy percentage. It's been millions of dollars, $5 billion to the tribe, including some to the general fund and some for reinvestment. Now, there really are no profits beyond what goes to the tribe. For the next now three-plus years, whatever does not go to the tribe... And I correct in reading the record that maybe 5% now, but within a few years, when the installment sale is completed, it would be 100%. Not of gross revenue, 100% of profits. Right now, all the profits are comprised in that 5% of gross revenue. And Judge, you're exactly right. In January of 2023, less than four years from now, the money now going to Eventide to pay for those assets will go to the tribe. That means about $10 million per year in perpetuity. Now, one of the errors made by the district court is while the court recognized that fact, the court somehow did not count that money on the tribe's side of the ledger. But whether we are using those monies to pay off the financier, Eventide, or to pay off a loan to a more conventional lender, Bank of America, those are monies going to benefit the tribe as well because they are reducing debt, and they are acquiring a valuable asset. And there's been no suggestion, and certainly no evidence, and no finding that the tribe is somehow paying too much for that asset. So there's no problem with the allocation. It is all going to the tribe in terms of profits, either by the percentage distribution off the top of gross revenue or by the money that we are using to buy these valuable assets. Now, I would note that much of a plaintiff's case rests on a stereotype, and we see that in that complaint, starting with that complaint. They use this pejorative label, rent a tribe. And they say there are now rent a tribe lending operations out there, just as there once were rent a bank lending operations before litigation shut them down. And they seek to besmirch our client with that rent a tribe label, which is a slur. Just as there are also legitimate bank lenders, there are legitimate tribal lenders. That's what we have here. For plaintiffs to suggest otherwise, because an Indian tribe is involved, is wrong. Big picture is the true lender. There's been no finding and no evidence to the contrary. And if you were to read nothing else in the joint appendix, I ask you to read the Declaration of Matt Mortorello, beginning at JA 1096. He is the bugaboo, the bugabear, who opposing counsel wishes to insert into this case in some misperception that he somehow is the puppet master behind all this and is akin to the other rent a tribe individuals in other cases. But that declaration will show that is not the case. This is not a rent a tribe scheme. This is a plan where the tribe is the true lender. Now, one of the errors made by the court was that there seemed to be two issues in this case. One is the initial burden of proof, which the court will have to address regardless of what it decides. And then the application of these various factors under the breakthrough case or Miami Nation. Since we've got to address those, maybe you could go to those and help us find our way through it. So we believe that the burden of proof rests upon the plaintiff. Even if it rests in some fashion upon the tribe, a burden of production, we met that burden when we showed that the tribe has created these entities and is claiming them as arms of the tribe. In fact, in support of our motion to dismiss, we attached 44 documents that show compliance with every one of the breakthrough factors. We think that's as far as the court need go. But if a court is going to look behind the tribal law, the tribal structure, the way it's set up, if a court is going to, in effect, pierce that tribal veil, then the burden should be upon the plaintiff just as it would be if a plaintiff were trying to pierce the corporate formalities and pierce a corporate veil. Now, the court below did not do that. The court below put all the burden on us. Supreme Court has noted that tribal sovereignty and state sovereignty are different. We ask this court to follow the Indian law jurisprudence of the Ninth Circuit. In an arm of the state case, they place the burden on the defendant. But when the issue is tribal immunity, the Ninth Circuit places the burden on the plaintiff. You see that in the Pistor case, you cite in our brief, we ask the court to do likewise. If the court does decide that the burden below was misallocated, as we believe the court should, then the decision by the court below cannot stand. Now, the court's second major error was in its use of Miami Nation. Until this case, the courts in this circuit used the breakthrough standard, which both the Tenth Circuit and the Ninth Circuit follow in only highly different forms. The court below began with breakthrough, but then it veered off and used Miami Nation instead and cited that case more than 30 times. But Miami Nation is a California state court decision. No federal circuit has ever adopted it. You take away Miami Nation and go back to breakthrough, the standard below cannot stand. And there are at least three ways where Miami Nation differs from breakthrough. Number one, back to one, but the creation, whether it's looking whether it's tribal law or state law, they have this thing about, well, did the tribe initiate the business or did it absorb a preexisting business? Where does that come from? Actually, Miami Nation, while it said that, didn't even use that. The law was clear that if a sovereign entity absorbs a non-sovereign entity, that does not diminish the sovereignty of the absorbing entity. We cite that in several cases in our prior brief on page 9. I would add to those the Eighth Circuit decision of Amerind Risk Management Court versus Malaterre 633 Fred 3rd 680, pinpoint is footnote 7. A sovereign entity does not automatically waive a sovereign immunity through the mere act of succeeding a corporation. It's either not entitled to a sovereign immunity or it's waived such immunity. Miami problem number two, rather than just looking at the purpose of the entity, as stated by the tribe, Miami Nation says, well, is it actually serving the purpose? And then Judge Payne, District Court, says, well, we're going to decide how effective it has been. I, the judge, will decide how effective it has been, but the court should not be sitting in judgment on the effectiveness of the business, particularly since the tribe needs to know, the law needs to know at the outset, whether the entity will have immunity or not. And they're going to look at, well, how well did you do this year? How effective were you this year? Sovereignty should not vary. Besides, the court said below, quote, big pictures lending operation has yielded concrete financial benefits for the tribe. $5 million, so it will be 30% of general revenue. Clearly, if you're going to use effectiveness, this entity has been effective for the tribe. Third differential is control. Clearly, these entities are controlled by the tribe. Why did the District Court say otherwise? Well, it gets into this manipulation thing about, well, what is the day-to-day management? Well, clearly, a tribe has the right, as any corporation would, to appoint a manager that is not part of the tribe. In fact, casinos do that all the time. How many immune Indian casino operations hire herods to manage their operations? The fact that one of our entities, Ascension, has a non-tribal manager, does not destroy sovereignty, and our other operation, Big Picture Loans, has a tribal member as its CEO in charge of day-to-day. So manipulation is the wrong standard, and when you look at the right standard right through, again, the decision below cannot stand. Let me talk briefly about the purpose factor, because there, too, the District Court veered off in the wrong direction. Not only misusing manipulation, but asking, well, what was Matt Martorello's purpose? Why did he do business with the tribe? His purpose is inconsequential. We see nothing nefarious in his purpose, but the question is what is the tribe's purpose in doing business with him or his businesses,  and the District Court seemed to suggest that the primary purpose was to help Mr. Martorello, not help the tribe. I'm not suggesting that's correct. I'm just commenting on that. Again, I'm not suggesting that I agree with that. I'm just pointing that out. I'd like you to comment on that. Well, so essentially, the idea below seems to be that by doing business with Matt Martorello's business, by acquiring Swissborn, that we are protecting him from something or another, or are we cloaking him with sovereign immunity? How can that be? Well, what is the evidence of that in any of that? There is no evidence. In fact, the evidence is quite to the contrary, because the case against these tribal entities has stayed in this appeal. The case against Matt Martorello goes on. If we win this appeal, the case against Matt Martorello will go on. He has no sovereign immunity. And the idea that somehow that is the purpose, some extravagant and futile act of altruism to protect this non-tribal guy, it just makes no sense. The purpose of the trial was to make money, make money for the tribe, and it has done that. And as Chairman Williams said about the business, quote, the business is the focus of our future. It's everything we've been looking for to take care of our tribe for years to come, and it's something that's very successful. So for these reasons, we believe the court below and others in our brief, the court below is in error. We ask the court to vacate the decision below and enter judgment for big picture and a century. Thank you. Thank you, Mr. Hearn. Mr. Wessler. Thank you, Your Honors. May it please the court, Matthew Wessler on behalf of the Apoese. Immunity is for governments. Before a commercial operation can secure for itself a sovereign's immunity, it must prove to a court that the sovereign's immunity is being used to protect an entity that is, as the Tenth Circuit has said, analogous to a government agency, as opposed to being used as a fictitious shield to avoid accountability for an obviously illegal enterprise. The district court here thoroughly investigated that question and reached a definitive conclusion. The defendant's bid for immunity here must fail because their enterprise looks nothing like a governmental agency. It instead operates as a cloak for an outsider's illegal. A casino looks nothing like a governmental agency, and yet tribes are allowed to run casinos all the time. That's correct, Your Honor. But I think there are some significant differences between the way a casino works and runs. I guess what I'm suggesting to you is it can't possibly be the case that a tribe is limited to creating and operating agencies of the tribe. That can't be right. Well, I would point, Your Honor, to the Tenth Circuit's own words in Breakthrough where it said, and I'm quoting, the question that we have to ask is whether the companies, quote, are the kinds of tribal entities that are, quote, analogous to a governmental agency. Analogous, but not the same in every respect. No, absolutely not, which is why I think the Breakthrough test, which we believe is the correct test, accounts for and recognizes that the inquiry is inherently fact-specific, and it asks the court to determine basically how closely aligned the commercial operation is with the tribe. And, I mean, let's be clear. Well, in this case, you have the tribe acquiring these assets, which will give them 100 percent ownership, soup to nuts in a few years of an entire lending operation for which they will get 100 percent of the revenue, 100 percent of the profits. What's the evil in that that you see? There's no evil in that, Your Honor, but the question is how is the entity operating in the current moment? What is the snapshot of the entity? Where do you get that test? I mean, a tribe is a sovereign entity. I mean, that question was resolved a couple hundred years ago. So as long as the tribe is operating a business and it has a substantial effect on the tribe, which in this case, as I understand the record, nearly a third of their revenue now comes from this entity. I'm confused by your argument. It seems like at the bottom line it's we don't like payday lending. Ergo, if the tribe is in payday lending, there is no tribal immunity. Well, I think there's a couple of responses I'd have to that, Your Honor. First of all, the test is not a profits test, okay? So the test isn't how much money is the tribe getting from the commercial enterprise. If that were the test, then any business that the tribe were to own would qualify as arm of the tribe and would be able to secure for itself the sovereign's immunity. This is not a referendum on the tribe. Just to be clear, the tribe absolutely has immunity. The only question in this case is whether a commercial entity that is working in part for the tribe is also entitled to share the sovereign's immunity, just as it is an arm of the state immunity. In that context, the same question essentially is being asked. Does an entity that is not the sovereign itself get to share in the sovereign's immunity? And the test isn't about profits. And there isn't any court breakthrough, Miami Nation, none of those cases, those courts that have looked at this question have asked only how much money does the tribe get now. But an underlying part of that, related to Judge Agee's question, is this suggestion from your briefs and the papers that this is all but a sham because all of the profits, or most of them, are going to someone, Mr. Martorello and others, who are not members of the tribe. You make that argument, don't you? We absolutely do make the argument. My point only to Judge Agee was that it's not just about profits. And, in fact, if you look at the factors, the factors don't say profits. They say financial relationship, right? And a financial relationship, as Breakthrough looked at this question, as Miami Nation looked at this question, is what does the financial arrangement look like? As we now have it today, the tribe gets 3% of the gross revenue. The rest of the money is going out from the tribe. They have 3% that goes to the tribe and 2% that gets reinvested back into the business. In Breakthrough, which they own on paper, but they don't actually operate it or manage it. Well, when you say the rest of the money goes elsewhere, it goes to pay off the debt on the agreement with respect to the purchase of the assets. And there's no indication in this record that that purchase was made at anything other than at arm's length face value. Well, I think, Your Honor, the district court, I mean, this gets us into what I think is a seriously insurmountable obstacle for the appellants in this case, which is the standard of review here. What we're talking about are fact findings that the district court made about each of these factors. Now, you've heard the other side say this is a legal inquiry. Well, I guess the first question is whether or not the court applied the correct tests. And they pointed to the fact that it relied on the tests from Miami Nation and mentioned that there were a number of instances where the court cited that test in lieu of Breakthrough. What's your response? I don't think there's any inconsistency between the two tests. And you heard my colleague say that no federal circuits have adopted Miami Nation, but in fact the Tenth Circuit, the very court that is responsible for the breakthrough factors itself, has embraced Miami Nation in a later case called Finn, which we've cited in our briefs, and the other side has said nothing about. And there, what the Tenth Circuit said when it was looking at the Miami Nation's test is what matters isn't just the formal arrangements, the paper documents. An outsider can transfer a company over to a tribe on paper. The tribe now owns the entity, delivers some sliver of revenue to the tribe, and all of a sudden the entity is entitled to share in the immunity. That isn't how it works. That isn't how the standard works. The standard asks what does the actual business look like? What are the actual workings? How is it operated? How is it managed? Is it outsourced? Who is actually working at the business? What we know in this case, and these are fact findings that are entitled to abusive discretion standard and can't be reversed only for clear error. So this court would have to actually set aside Judge Payne's fact findings in this case, not just that it disagrees with them, but that they were so clearly wrong. He may have found facts, but then we have to apply the law to the facts, which is the minimum is a mixed question. Well, Your Honor, I would again point you to breakthrough, and I think the Tenth Circuit there was very clear. It said that the legal question in the case, in these cases, is what is the appropriate test? But the factual issue in the case is how are those factors met? What are the facts that support them or not, and how do you actually balance them? The facts would be the income they receive now and their contractual relationship. So why don't you tell us with specificity what you believe are the defects that deny tribal immunity under breakthrough or Miami Nation? Sure, and I view them together, but I'm happy to go through them. So on purpose, right, which there are five or six depending on what gloss you want of these factors, but on the purpose factor, what they say is we have a tribe resolution that says we're intending to create these entities and have them share in our immunity. But as Judge Payne found, the whole operation existed before it became a tribal entity. It was a fully functional lending operation called Bellicose Capital that existed outside the tribe, and it was simply absorbed into the tribe to create an additional layer of immunity insulation from what was obviously illegal lending under state law. We also know when it comes to this question, in purpose... So here they bought an asset. Tell me what disqualifies a tribe from tribal immunity when they buy an asset. Sure, and, Your Honor, just to be clear, it is not whether the tribe gets immunity. It's whether this entity, this commercial operation, is entitled to share in that immunity under arm of the state immunity. One of the key questions is how closely aligned is this entity with the core reasons why the tribe itself has immunity? In other words, economic self-determination, self-sufficiency, that kind of thing. So one of the key questions is how many tribe members are employed by this operation? Here's what we know. There are five total that are employed in this operation. One of them is the CEO, and four of them have entry-level positions on the tribe. The rest of the business, and Ascension is, as Judge Payne found, the critical and crucial driver of this lending operation. It exists entirely off the reservation in Atlanta, in the Virgin Islands, in Puerto Rico, and employs no tribal members whatsoever. There are no training programs designed to hire tribe members. Unfortunately, one of the sad consequences of tribal history is the fact that many reservations and its inhabitants have been deprived of educational opportunities, economic opportunities. And so as a result, I don't think it at all unusual that the tribe would rely, at least initially, on outsiders to run this business. I get the point. I think it's relevant, but I don't see how it's outcome determinative. Your Honor, none of this is outcome determinative. We don't take the position that any one factor. You seem to be suggesting that the tribe could never hire outsiders or even have a majority of outsiders run its business. If you take me to suggest that, I was mistaken in the way that I was describing it. That isn't our suggestion. This is a multi-factor test that requires balancing. It requires balancing of the facts on the record as it's presented to the district court. And none of these factors is dispositive. There's no thumb on the scale one way or the other. And again, this is not a referendum on a tribe's access to legitimate businesses that can share in its immunity. The only question a court has to ask, though, is whether the particular business enterprise is so closely aligned with the tribe that it can be treated as an arm of the tribe for purposes of immunity. There's evidence in the record that the co-managers, in this case, Williams and Hazen, did have oversight, and they had to receive approval. The outsiders had to receive approval from these managers for a bunch of decisions. That's in the record. There's no question about that. I understand, Your Honor, but again, this court does not sit as a fact finder in this case. Well, you know, it's not absolute deference. The standard is clearly erroneous. And if there are facts in the record suggesting that Judge Payne got it wrong with respect to some of these facts, I think we're entitled to consider that. With respect, Your Honor, I think the standard is whether his finding of these facts was implausible. And I do not think in this record that this court can reach that conclusion to set aside these findings. You're right. I don't dispute that the record contains some evidence that Hazen and Williams had contractual obligations that put them into a position of management and oversight. But we also know from the same record that they couldn't tell you almost anything about how the business worked. They could not tell you why Big Picture was created. They could not tell you how Ascension was run at all. They said the only person who really knows that is McFadden, the president of Ascension, and he is not on the tribe. If they had simply had McFadden as the CEO and president and eliminated these managers, would that have been improper? That would not solve the problem. Had they eliminated McFadden and had Hazen or Williams themselves actually assumed direct managerial role, that might have tilted the balance in a different direction. But that also might have made the business less than economically viable, at least on the front end. I think the question that this court has to confront here in this case is what is the standard that is going to exist for tribal efforts to create business and commercial enterprises that they can then shield from accountability when and if they are brought into court. Let's go back to Judge Diaz's initial question. What's the difference here between the casinos and the lending operations? Sure. So a couple of things, Your Honor. Number one, and this comes from breakthrough, what we know about the casino is at the current time when the entities were insisting on immunity under Arm of the Tribe immunity, 100% of the revenue was going to the tribe. In a couple of years, 100% will go to the tribe here. And, Your Honor, in a couple of years, if the enterprise looks different than it looks now, a court could reach a different conclusion than the one that the court reached today. You're dealing with a sovereign, a tribal immunity that flows through under Arm of the Tribe. How can you, it just makes no sense to me to say that, in effect, this is what I understand your argument to be, had they made a cash purchase of these lending enterprises, Bellicose and the others, so they owned 100% of it, and had gone into the commercial market and went to Bank of America or SunTrust and borrowed the money instead of doing an owner-financed purchase, that that would be okay. Even though the loan covenants that they would have had in a commercial market, which would have cost a lot more probably than they paid here, would have probably been as onerous in restricting the amount of income available for use of the tribe until the loan was paid off. I'm just, I have a lot of difficulty finding what the distinction is by this short-term purchase of an asset, which would seem like to me a fairly savvy business transaction on their part. No one is doubting their ability, the tribe's ability to purchase commercial operations in whatever way they see fit. What Judge Payne looked at and what I think this test requires the court to do is ask, you can run your business, but we're only going to allow you to obtain the immunity of the sovereign if your business is sufficiently closely aligned to the tribe. So if they had done a cash deal and bought this business so they were getting 100% of the revenue now, what would you say? Yes. I think that the calculus could be entirely different. And in fact, in breakthrough, that's what we see these casinos doing. But because they had to do a short-term finance transaction, they lose tribal immunity. It's not, Your Honor, it isn't a dispositive factor one way or the other. This is not a formalistic which fact, I see that I'm out of time. Excuse me, I still have five minutes left. This is not a one factor is outcome dispositive one way or the other. What Judge Payne did is he looked at all of the factors, including the purchase history, but also including the internal operations of this enterprise, and he said of the six factors, five cut against immunity. Only one, method of creation, cuts in favor of immunity. When he weighs those factors, the underlying decisions he makes about who was employed, where the revenue came from, where it went to, all those things are factual decisions subject to the clear error rule. But when he then applies the test of breakthrough, that's not a factual decision. That applies a legal analysis to the facts found, and that's a different standard which we're entitled to review and make our own call. I would respectfully suggest that, Your Honor, it would be splitting with the Tenth Circuit in the way that it understood this test. And, again, I'll just quote you what breakthrough said. Application of that test to the relationship between the tribe and the entity, so the application of that test is a factual issue. That's what the Tenth Circuit said, and I think that's what Judge Payne attempted to do when he followed breakthrough, was he looked not just at the facts, but then he balanced those facts. And balancing of those facts, where the line is, is an inherently factual question because it asks very specific factual questions. Who runs the business? Where is the business primarily located? Who is making day-to-day management decisions? What is not just the profits, but the financial arrangement? The snapshot of what this picture looks like in this case may be different from the way another lender does it on another tribe. And, in fact, there's good evidence of that. It's not just the casinos work under Arm of the Tribe sovereign immunity. The defendants have cited to you cases in which courts have said, yes, lenders can obtain Arm of the Tribe immunity. There's a case called Everett coming out of Virginia in this circuit where the court said 70 tribe members are employed in that business on the tribal reservation, and that tips the balance. If the tribe here had, through Big Picture and Ascension, had purchased a casino under the same short-term installment contract, same terms as you have here in terms of restricted revenue over the term of the loan, as I understand your position, for the loans they would make now, there's no tribal immunity. But when they pay off the, or for the casino transactions, there would be no tribal immunity. But as soon as they've paid off the debt, then there would be tribal immunity. My position is that it's a multi, I'm trying to try to answer your question. It's a multi-factor test. So how the financial arrangement is structured is only one of several factors. Let me, if I can tweak your hypothetical. Let's say that the casino was not located on the tribe, was located in Florida, and employed 95% of its employees were not members of the tribe, and yet still the tribe was obtaining 100% of the revenue from this casino. Okay? I don't know how that would come out because a court would have to address each of those factors and balance them to ask the ultimate question, which is, is this commercial enterprise so closely aligned with the tribe that it can share in the sovereign's immunity? It's a similar kind of question that works in the arm of the state immunity. And I think this court, as well as most courts, should be cautious and careful about extending sovereign immunity outside and beyond the four corners of the sovereign. That caution comes from the Supreme Court, which has said it's a strong medicine immunity because it means you are completely immune from suit. So before we unlock that door and make that doctrine available to a commercial operation, we need to be satisfied that the operation is actually under the control of the tribe and is being run and done for the benefit of the tribe. And benefit here doesn't just mean how many millions of dollars is the tribe getting. It means is it contributing to the economic self-sufficiency of the tribe? Well, there are many different ways to do that, though. The fact that a majority of employees might not be Native Americans doesn't mean that the entity as a whole is not contributing to the economic sufficiency of the tribe. I agree with you. There is no one right way to do it. But what Judge Payne did in this case, and he did it carefully, was he looked at each of the factors that the Tenth Circuit laid out, and he said none of them but one favors immunity in this case because the enterprise has not been structured, arranged, or has been put together in a financial way that is going to benefit the tribe. I see I'm out of time. Thank you, Your Honors. Thank you. Mr. Heard, do you have some time to observe? Thank you, Your Honor. It's clear that opposing counsel does not like appliance business very much, but the standards for tribal immunity don't depend upon whether someone likes the business. Whatever is decided here today with respect to a standard will apply obviously not just to this case, where the tribe is very deserving, but also to all other tribal business cases in the Fourth Circuit,  Opposing counsel's argument reminds me that lawyers don't always make the best economists. He said that maybe there will be sovereignty when the note is paid in 2023, but not now. What he overlooks is the present value of that future income stream, $10 million a year, starting in January 2023. That seems pretty sweet to me. Mr. Heard, you seem satisfied for us to apply the breakthrough test, but I was curious what you thought about the Colorado Supreme Court's analysis in cash advance, this sort of three-part test that, at least to me, seems to begin with the presumption that the tribes should be granted some level of deference in how they operate a particular business or operate the tribe. Is that a more appropriate test in your view? Well, the case was trial below under breakthrough, but we certainly agree with the Colorado case that deference to the tribe is extraordinarily important, as is deference to any governmental body when it makes statements about its purpose or arrangements, and we believe that deference also comes into play in breakthrough. When you, as we believe, should look at what the tribe has said about its purpose and look at the arrangements the tribe has set up, and then if there's to be some penetration of that, some reputation of that, then that burden needs to rest with them. Are the breakthrough factors the same kind of factors that we would apply in arm of the state cases? No, Your Honor. Oberg would be that case, and we would prevail under Oberg. So that's more deferential to the state than it would be to the tribe? It is. In fact, under Oberg, the first criteria under Oberg is simply whether the tribe is, quote, functionally liable, which means would you lose money if there's a judgment against the arm of the state entity? Would the state treasury lose money? Well, certainly the tribe would lose money if there were the judgment they seek against these tribal entities because it would destroy the business. That's what they're asking for, an injunction to make the business go out of business. Now, opposing counsel said this was an illegal enterprise. Obviously, that issue has not been reached, but it is not. We comply with applicable law, and we're not a payday lender. Opposing counsel talks about Judge Payne's factual findings. Well, this court is not required to accept, for example, a non sequitur, and we see that where the court below faults Chairman Williams for not having a detailed knowledge of the day-to-day operations of the big picture, but then imputes that to the CEO, Shelly Hazen. That's a non sequitur. And the chief, Chairman Williams, is the chief of the whole tribe. He sits as co-manager to maintain and monitor what happens to these things, but he's not the day-to-day guy. Michelle Hazen is the day-to-day CEO of DPL, which is headquartered on the reservation, and Brian McFadden, who reports to the tribe. He is the CEO of Ascension. Now, if we were to find in this case that harm of the tribe immunity applied, couldn't Congress, if it found payday lending to be a particular evil, particularly as conducted by Indian tribes, they could restrict tribal immunity, could they not? Your Honor, they certainly could. Again, this is not payday lending. This is a different kind of lending. But if Congress believes that tribal lending requires a different solution than what the Supreme Court's current tribal immunity policy would require, Congress can deal with that, just as it dealt with Indian gaming. If Congress wants to set a new set of rules for tribal lending, it can do that. Now, let me mention very briefly why opposing counsel is wrong in saying that we are not, that we are a renter tribe operation, because I do want to focus in on that. The key hallmark of a renter tribe operation is where the tribe is the one, some tribal entity makes the loan on paper and it automatically transfers it to somebody else who is putting the capital in the business. We don't do that. Big Picture doesn't transfer any of its loans. And the record says the tribe has now over $7 million of its own capital in the loan portfolio. So we are certainly not a renter tribe operation. Opposing counsel cited Everett, a district court case in this circuit, which uses a break-through, not Miami Nation. In fact, opposing counsel did not really defend the lower court's use of Miami Nation. Other than to note that the Finn case in the Tenth Circuit made reference to it. That was a discovery issue. It was not a factors issue. Where do the loans originate? On the reservation. Big Picture originates the loans Judge Payne found. All loans originate on the reservation. Opposing counsel said that somehow Matt Martorello is profiting from this. Judge Payne disagreed with that. J.A. 211 and 12. Opposing counsel said that Bellicose was a lender taken over by Big Picture. Not true. Bellicose was never a lender. Bellicose and its subsidiary, SourcePoint, were services providing some of the same services that Ascension now provides. But it was never a lender. And with respect to who is running the show, call the court's attention to the appendix 122329 and 1192 and 487. These are examples of, with Ascension, Ron McFadden having to go back time and time and time again to get the approval for major changes from the co-managers, Michelle Hazen and the chairman, James Williams. So for all these reasons and those mentioned earlier in our brief, the district court erred. We ask the court to reverse the judgment below in a judgment for Big Picture and Ascension. Thank you. Thank you. We'll come down and greet counsel and proceed to our next case.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz